FILED
2026 Mar-03  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **PATRICK BISHOP, SR.,** | ) |
| **Plaintiff,** | ) |
| v. | ) Case No.: 2:23-cv-1048-AMM |
| **CITY OF LEEDS,** | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION**

This case comes before the court on a motion for summary judgment filed by defendant City of Leeds. Docs. 19, 20. The motion is fully briefed. Docs. 24, 25. For the reasons explained below, the motion is **GRANTED.**

**I.   BACKGROUND**

This case involves an employment dispute. These are the material facts construed in the light most favorable to plaintiff Patrick Bishop, Sr.:

Around 2020 or 2021, Mr. Bishop received an email from the Leeds Police Department's recruiting officer, informing Mr. Bishop "that [his] name was received from the Personnel Board that [he] was a[n] . . . [e]ligible applicant for a police officer." Doc. 18-1 at 8–9. When he received the email, Mr. Bishop was employed as a police officer with the Adamsville Police Department. *Id.* at 8. Mr. Bishop submitted an application paperwork packet to the Leeds Police Department. *Id.* at 9.

Mr. Bishop was interviewed by several individuals from the Leeds Police Department, including Lt. Griffen, Lt. Loebler, and Captain Reeves. *Id.* at 10. Mr. Bishop was then called in to undergo a drug screen, which he completed. *Id.* After the drug screen, Lt. Griffin offered Mr. Bishop a job with the Leeds Police Department that would begin on June 29, 2021. *Id.*

On June 28, 2021, Lt. Loebler informed Mr. Bishop that the Leeds Police Department needed Mr. Bishop to bring his Social Security card, driver's license, birth certificate, military records, and other documents to complete the hiring process. *Id.* at 11, 47. Lt. Loebler "said his records [did] not show a copy of [Mr. Bishop's] driver's license and Social Security number," though Mr. Bishop noted that "they should be in [the] packet" he had submitted. *Id.* at 11. Mr. Bishop drove those documents to the Leeds Police Department and let Lt. Loebler make copies. *Id.* at 12.

The next day, June 29, 2021, Mr. Bishop reported to the Leeds Police Department and met with his field training officer. *Id.* Mr. Bishop spent the day filling out onboarding documents. *Id.* That day, Chief Atkinson swore in Mr. Bishop. *Id.*

The day after being sworn in, Mr. Bishop arrived at work, met with his field training officer, and started out on patrol with his field training officer. *Id.* at 13. One of Mr. Bishop's supervisors called Mr. Bishop in from patrol because the supervisor

2

"wanted [Mr. Bishop] to go with one of the investigators to help him investigate an alleged rape in Alabaster." *Id.* Mr. Bishop questioned the juvenile suspect and the suspect's mother before returning to his field training officer for the remainder of his shift. *Id.* at 13–14.

The next day, July 1, 2021, Mr. Bishop again reported to work. *Id.* at 14. After roll call, Mr. Bishop went out on patrol with his field training officer. *Id.* Shortly after starting patrol, Mr. Bishop was called back to the police department, and Mr. Bishop was told "that there was an issue with a drop-down box from [his] hire" and "an issue between the [Jefferson County] Personnel Board and City Hall." *Id.* at 14. Mr. Bishop "was then told it should be cleared up by . . . the 6th of July." *Id.* Mr. Bishop "was further advised that until it was cleared up, [he] was not to come back to work." *Id.* at 15. "They said don't come back to work until it was cleared up and they would call [Mr. Bishop] . . . ." *Id.* But Mr. Bishop did not have contact with anybody from the Leeds Police Department until "[a] few weeks later . . . when they contacted [him] and told [him] [he] needed to turn [his] stuff in." *Id.* Mr. Bishop was told that after the police department got his driver's license and entered his "information into the Jefferson County Personnel Board website for new employees to have [him] included as a new employee, . . . they saw it was indicated on the Personnel Board's website that [he] was ineligible for rehire." *Id.* at 16. But Captain Reeves called the issue a "glitch" and told Mr. Bishop that it "[s]houldn't be an

3

issue" and that the police department would "figure it out." *Id.* at 25. Mr. Bishop complied and turned his equipment in. *Id.* at 15.

According to the police department, the issued appeared when "[r]etired Leeds Chief of Police Jim Atkinson submitted [Mr. Bishop's] application for employment to Mayor David Miller (the appointing authority) for review and approval," Doc. 18-2 at 5, as the department was instructed to do, Doc. 18-1 at 63 ("Mayor Miller . . . has directed that such a comprehensive report be compiled on all applicants to be submitted to him for approval before an offer of employment is made."). "[A]s with all new hires, City Administrator Brad Watson requested a copy of [Mr. Bishop's] driver's license to include his information in the Jefferson County Personnel Board electronic database." Doc. 18-2 at 6. "While attempting to add [Mr. Bishop's] personnel information into the Jefferson County Personnel Board database, there was a notation indicating [Mr. Bishop] was not eligible for rehire via the Jefferson County Personnel Board." *Id.* at 5. "Therefore, on July 1, 2021, Investigator B. Chalian was directed to conduct a background investigation on [Mr. Bishop]." *Id.*; *see also* Doc. 18-1 at 58. July 1, 2021, was Mr. Bishop's third shift of work. *See* Doc. 18-1 at 14. The investigator's report revealed a record of several reprimands. *Id.* at 21–23, 58–60; *see also id.* at 7–8. "Once Mayor Miller received the results of that background investigation and was aware of [Mr. Bishop's] past disciplinary issues at other law enforcement agencies, Mayor Miller declined to offer

4

[Mr. Bishop] employment with the Leeds Police Department." Doc. 18-2 at 5. "[T]he reason Mayor Miller declined to extend [Mr. Bishop] an offer of employment was based on [Mr. Bishop's] poor disciplinary history with previous employers." *Id.* at 5–6; *but see* Doc. 18-1 at 20 ("[O]ne side, they're saying it's eligibility; one side, disciplinary. If I were not eligible, I would have never received an e-mail from Leeds in the first place.").

But in August 2020, Mr. Bishop had noticed the error on his rehire status, and he had "advised the Jefferson County Personnel Board . . . that there was inaccurate information." Doc. 18-1 at 17; *see also id.* at 53. In October 2020, Mr. Bishop sent another email to the Personnel Board stating that he wanted the Board to "remove and correct the record of [his] service/departure of the Jefferson County Sheriff's Department." *Id.* at 17–18, 52. The email explained that Mr. Bishop had resigned with the consent of Sheriff Pettway, but Captain Nashonda Howard (the internal affairs division commander) "submitted erroneous information with malice to the personnel board stating 'Terminated.'" *Id.* at 52. "[T]he Termination [was] still on [his] record with 'DO NOT REHIRE.'" *Id.* The Board responded that it had received his "appeal correspondence on August 10, 2020 in response to a disqualification of [his] application notice due to a negative rehire status associated with [his] separation from employment with the Jefferson County Sheriff's Office." *Id.* at 51. The Board explained that the "previous correspondence included a letter from

5

Sheriff Pettway indicating that [Mr. Bishop] resigned [his] employment and that [he is] eligible for rehire," but "[t]he letter lacked a date and did not have an original signature, so [the Board] followed up with Sheriff Pettway to confirm the authenticity of the letter." *Id.* at 23, 51. "[Sheriff Pettway] confirmed that he prepared and sent the letter to [Mr. Bishop] and that [Mr. Bishop's] rehire status should be changed to eligible." *Id.* at 51. "As a result of [Mr. Bishop's] appeal information and Sheriff Pettway's confirmation, [the Board] updated [Mr. Bishop's] rehire status to eligible and sent [Mr. Bishop] a notice on August 17, 2020 indicating that [his] application was now considered eligible." *Id.* "Along with the updating of [his] application, [his] rehire status in the Personnel Board's system was updated to eligible for rehire." *Id.* The Board assured Mr. Bishop that his "separation from employment is recorded as 'Voluntary – Personal Reasons' and [his] rehire status indicates eligible for rehire." *Id.* Mr. Bishop considered the matter resolved until the Leeds Police Department told him that he was listed as ineligible for rehire. *Id.* at 18, 51.

On July 2, 2021, after Mr. Bishop was sent home by the Leeds Police Department and notified of his ineligibility, Mr. Bishop once again emailed the Personnel Board. *Id.* at 51. Mr. Bishop informed the Board that "Captain Reeves (Leeds Police Department) advised [Mr. Bishop] that [his] personnel board file (Computer Screen) shows that [he] resigned not in good standing from the Jefferson

6

County Sheriff's Department in 2020. This is incorrect." *Id.* He reminded the Board that he and Sheriff Pettway "worked and got this corrected . . . earlier in the year." *Id.* He reiterated that, as the Board has reassured him, his "file (drop down box per Leeds) should read 'Resigned in Good Standing / Eligible for rehire.'" *Id.*

According to Mr. Bishop, the Leeds Police Department hired Officer Jacob Turnbloom, a white male, despite past disciplinary history. *Id.* at 24. Officer Turnbloom had been working at the Leeds Police Department when Mr. Bishop was hired, and Mr. Bishop "kn[e]w of him." *Id.* According to Mr. Bishop, "[t]here was a disciplinary history" from Officer Turnbloom's time at the Adamsville Police Department. *Id.* Mr. Bishop did not "know any specifics as to [Officer Turnbloom's] disciplinary history," but Mr. Bishop believes that Officer Turnbloom was written up for "insubordination possibly." *Id.*

On August 9, 2023, Mr. Bishop filed this suit against the City of Leeds, alleging racial discrimination and retaliation under Title VII and racial discrimination under 42 U.S.C. § 1981. Doc. 1 at 5–9. Mr. Bishop alleged that he "began employment with the City of Leeds Police Department and was later wrongfully removed from his position after the City of Leeds Mayor, a white male, discovered that [Mr. Bishop] was African American." Doc. 1 ¶ 24. The police department "then immediately hired a white male who . . . had a lengthy disciplinary history as a police officer, to replace [Mr. Bishop]." *Id.* ¶ 25. Mr. Bishop believes

7

that "the information that the City of Leeds provided [him]" regarding his eligibility for rehire "is incorrect," Doc. 18-1 at 26, and that his termination was due to his race, *id.* at 64 ("I was instructed by the City of Leeds not to return to work. This was after a City of Leeds staff member for the Mayor of Leeds, David Miller, a white male, asked for a copy of my driver's license, which showed my picture and my race."). The court dismissed "Mr. Bishop's retaliation claim, Section 1981 claim, and Section 1983 claim." Doc. 8 at 12. The City moved for summary judgment on the remaining claim for racial discrimination under Title VII. Docs. 19, 20. The motion is fully briefed. Docs. 24, 25.

## II.  LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A

8

material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

## III. DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To "survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in [his] favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019). A plaintiff can do this in three ways: (1) "by satisfying the burden-shifting framework set out in *McDonnell Douglas*," *id.*, (2) by "present[ing] direct evidence of discriminatory intent," *id.* n.6, or (3) by "demonstrat[ing] a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination," *id.* (cleaned up).

"[U]nder *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing" three things: "(1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside her class more favorably." *Id.* at 1220–21. The "plaintiff must show that [he] and [his] comparators are 'similarly situated in all material respects.'" *Id.* at 1224. "If the plaintiff succeeds

in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Id.* (cleaned up).

Based on the evidence in the record, Mr. Bishop has not provided a comparator outside of his protected class who was similarly situated with him in all material respects. In Mr. Bishop's complaint, he alleges that "[a]fter [Mr. Bishop] provided a copy of his license and was instructed to not return, the City of Leeds immediately hired Officer Jacob Turnbloom, a white male." Doc. 1 ¶ 17. "Upon information and belief, Officer Turnbloom has an extensive disciplinary history as a police officer." *Id.*

Mr. Bishop provides insufficient evidence to support his assertions. He maintains that "Jacob Turnbloom had a disciplinary history with his previous employer," Doc. 24 at 2, but the only supporting evidence is his own testimony in which he offered uncertain speculation about the extent of Officer Turnbloom's disciplinary history, *see* Doc. 18-1 at 24. When asked if he knew Officer Turnbloom, Mr. Bishop replied that he "kn[e]w of him." *Id.* Mr. Bishop asserted that Officer

11

Turnbloom had been "[w]ritten up at the City of Adamsville by the then Sergeant." *Id.* But when asked about the extent of the discipline or "specifics" about Officer Turnbloom's disciplinary history, Mr. Bishop stated that he "[didn't] know the whole story." *Id.* He admitted that he did not know what Officer Turnbloom was accused of, though he conjectured that "it was insubordination possibly." *Id.* That is the sum of the evidence Mr. Bishop cites for his statement that "Jacob Turnbloom had a disciplinary history with his previous employer." *See* Doc. 24 at 2.

Mr. Bishop has produced no evidence that Officer Turnbloom had a disciplinary history as extensive as Mr. Bishop. *Compare* Doc. 18-1 at 58 (detailing at least three incidents in which Mr. Bishop was reprimanded by previous employers), *and id.* at 7–8 (explaining the various times Mr. Bishop had been reprimanded and describing the consequences, including suspension), *with id.* at 24 ("I don't know the whole story [about Officer Turnbloom]. . . I think it was insubordination possibly."). Nor has Mr. Bishop provided evidence that Officer Turnbloom's alleged misconduct was similar in nature to Mr. Bishop's. *See id.* at 58 (describing one of Mr. Bishop's incidents as "jumping the chain of command"). And finally, even if the court were to take Mr. Bishop's speculation about Officer Turnbloom's history as true, Mr. Bishop has not alleged that the City was aware of Officer Turnbloom's past misconduct.

And despite the complaint's assertion that "the City of Leeds immediately hired Officer Jacob Turnbloom, a white male," after Mr. Bishop was terminated, Doc. 1 ¶ 17, the undisputed facts show that Officer Turnbloom had been working for the Leeds Police Department for over a year before Mr. Bishop even applied. *See* Doc. 18-1 at 24; Doc. 20 at 7. The City asserts as an undisputed fact that "Officer Jacob Turnbloom was hired by the City of Leeds on March 10, 2020," Doc. 20 at 7, and Mr. Bishop does not dispute this fact, *see* Doc. 24 at 1–2. Mr. Bishop admitted in his testimony that Officer Turnbloom "was at Leeds when [Mr. Bishop] was hired by Leeds." Doc. 18-1 at 24. Accordingly, the court cannot conclude that Mr. Bishop has provided a comparator similar to him in all material respects.

But "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case" because a "plaintiff will always survive summary judgment if he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (cleaned up). The Eleventh Circuit recently explained district courts' improper use of *McDonnell Douglas* as "the only game in town," and provided a "roadmap" "for district courts to properly review summary judgment motions. *Ismael v. Roundtree*, 161 F.4th 752, 763–64 (11th Cir. 2025). If, as is the case here, "the plaintiff cannot establish a prima facie case, [he] does not automatically lose on summary judgment." *Id.* at 764. Instead, courts "should ask

whether [a plaintiff's] circumstantial evidence, when artfully adhered together and viewed as one, allows a reasonable juror to envision an image of [discrimination] and find in [the plaintiff's] favor." *Id.* In other words, "a district court must turn to evaluate the evidence before it, applying the duly promulgated Rule 56 summary judgment standard." *Id.* at 765.

Mr. Bishop has not provided a "convincing mosaic of circumstantial evidence," and he has not demonstrated a genuine dispute of material fact. *See Lewis*, 934 F.3d at 1185. Mr. Bishop alleges that he was "wrongfully removed from his position after the City of Leeds Mayor, a white male, discovered that [Mr. Bishop] was African American." Doc. 1 ¶ 24. From this, Mr. Bishop concludes that his race was the motivating factor in his termination. *See* Doc. 24 at 6. Beyond speculation, Mr. Bishop has provided no evidence that race was even a reason—let alone the reason—for his termination. *See* Doc. 18-1 at 26 ("It's my position that the information that the City of Leeds provided is incorrect.").

Mr. Bishop alleges that Mayor Miller "has shown to [Mr. Bishop] a pattern of racism" through statements "on television several times, like everybody else in the state of Alabama and around Jefferson County." *Id.* He specifies that Mayor Miller has said "several negative things about City Councilman Ms. Ragland-Price," who is African American, though he could not offer examples when asked. *Id.* at 26–27.

But Mr. Bishop concedes that beyond that, he has not heard anyone associated with the City of Leeds say anything "derogatory about African Americans." *Id.* at 27.

Undisputed evidence shows that around the time Mayor Miller discovered Mr. Bishop's race, Mayor Miller also discovered that Mr. Bishop had a history of disciplinary issues with several of his previous employers. *Id.* at 58–60, 63; Doc. 18-2 at 5. Mayor Miller decided not to employ Mr. Bishop, and though Mr. Bishop accuses Mayor Miller of lying about his true motivations, *see* Doc. 18-1 at 64, Mr. Bishop has offered this court no evidentiary basis to believe that Mayor Miller's decision was based on anything other than his disciplinary history. *See Fernandez v. Seaboard Marine LTD.*, 135 F.4th 939, 956–57 (11th Cir. 2025) (holding that even when the plaintiff "has enough evidence to hypothesize" that the plaintiff's position was correct, "a jury cannot infer facts based on speculation and conjecture" (cleaned up)); *Garguilo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) ("[T]o oppose [a] properly supported motion for summary judgment, [the nonmovant] must come forward with specific factual evidence, presenting more than mere allegations."); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("For factual issues to be considered genuine, they must have a real basis in the record. . . . For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." (cleaned up)). Based on the evidence Mr. Bishop has provided, no reasonable jury could find in his favor.

Mr. Bishop argues that "there are genuine issues of material fact," including "whether the Personnel Board notified Leeds that the Plaintiff was not eligible, which he was." Doc. 24 at 6. But that is of no moment. Regardless of Mr. Bishop's eligibility for employment, his disciplinary history remains. *See* Doc. 25 at 3 ("Although the issue with the Jefferson County Personnel Board website was eventually cleared up, Mayor Miller declined to offer [Mr.] Bishop a position due to the multiple disciplinary actions . . . which [were] discovered during Investigator B. Chalian's background investigation."); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." (cleaned up)).

The second "genuine issue[] of material fact" that Mr. Bishop alleges is "whether Mayor Miller relied on purported 'discipline' of [Mr. Bishop] at another agency to discontinue [Mr. Bishop's] employment with Leeds." Doc. 24 at 6. The City stated under oath that "the reason Mayor Miller declined to extend [Mr. Bishop] an offer of employment was based on [Mr. Bishop's] poor disciplinary history with previous employers." Doc. 18-2 at 5–6. And Mr. Bishop disputes this as "patently false as [Mr. Bishop] was already sworn in and worked several shifts as an employee." Doc. 24 at 2. Whether Mayor Miller's decision occurred before or after Mr. Bishop worked a shift does not establish that the decision was based on race.

Mr. Bishop's attempt to dispute Mayor Miller's reasoning simply because it occurred after Mr. Bishop worked a few shifts is based on nothing more than speculation or conjecture. *See Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024) ("However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

## IV.   CONCLUSION

For the reasons explained above, the City's motion for summary judgment is **GRANTED**.

**DONE** and **ORDERED** this 3rd day of March, 2026.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE